STEPHEN T. BRADLEY'S CASE.

No. 98-P-1379.

Suffolk. September 11, 1998. - April 22, 1999.

Present: WARNER, C.J., PERRETTA, & LENK, JJ.

*Workers' Compensation Act,* Amount of compensation, Average weekly wages. *Statute,* Construction. *Words,* "Average weekly wages."

The vacation pay of an employee who is also receiving partial incapacity compensation benefits pursuant to G. L. c. 152, § 35, is to be treated as wages, and not as a "fringe benefit," and is to be included in the calculation of the amount of his compensation benefits for the period in question. [653-656]

APPEAL from a decision of the Industrial Accident Reviewing Board.

*John K. McGuire, Jr.,* for the employee.

*Richard W. Jensen* for the insurer.

PERRETTA, J. On a report by a single justice of this court on the employee's appeal from a decision of the reviewing board of the Department of Industrial Accidents (department) summarily affirming the administrative judge, we are presented with the question whether vacation pay received by an employee who is also receiving partial incapacity compensation benefits pursuant to G. L. c. 152, § 35, is to be treated as earnings or as a fringe benefit. The administrative judge concluded, on undisputed facts, that the employee's vacation pay counts as wages, to be included in the calculation of the amount of his compensation benefits for the weeks in dispute. We affirm.

1. *The undisputed facts.* About two weeks after he was injured in the summer of 1993, Stephen T. Bradley (employee) returned to work at the Commonwealth Gas Company (employer) in a light duty position. Because his pay in this post-injury position was less than what he previously had earned as a serviceman,

he received partial incapacity benefits from the employer's licensed self-insurer, Commonwealth Energy Systems (insurer).

In July, 1994, Bradley took the vacation he was allowed under the terms of the collective bargaining agreement between the employer and its employees. According to those terms, employees are entitled to receive two weeks' vacation, with pay, "provided their continuous regular employment preceded January 1st of the current vacation year." Employees with longer continuous service were entitled to longer vacation periods, and, in July, 1994, Bradley, who had worked for the employer for over twenty years, took three weeks of vacation. As provided in the bargaining agreement, a week's vacation pay was to be computed on the basis of the employee's "prior year W-2 earnings divided by the number of pay periods in the year," with certain adjustments for holidays, sick leave, and union activities.

2. *The disputed method of computation.* Partial incapacity compensation benefits are determined in accordance with the terms of § 35, which, as amended by St. 1991, c. 398, § 63, reads as follows:

> "While the incapacity for work resulting from the injury is partial, during each week of incapacity the insurer shall pay the injured employee a weekly compensation equal to sixty percent of the difference between his or her *average weekly wage before the injury* and the weekly wage he or she is *capable of earning after the injury,* but not more than seventy-five percent of what such employee would receive if he or she were eligible for total incapacity benefits under section thirty-four. An insurer may reduce the amount paid to an employee under this section to the amount at which the employee's combined weekly earnings and benefits are equal to two times the average weekly wage in the commonwealth at the time of such reduction." (Emphasis added.)

As here relevant, the meaning of "average weekly wage," defined in G. L. c. 152, § 1(1), as amended by St. 1991, c. 398, § 13, is:

> "[T]he earnings of the injured employee during the period of twelve calendar months immediately preceding the date of injury, divided by fifty-two . . . .

> "Except as provided by sections twenty-six and twenty-seven of chapter one hundred forty-nine, such fringe benefits as health insurance plans, pensions, day care, or education and training programs provided by employers shall not be included in employee earnings for the purpose of calculating average weekly wages under this section."

The parties have stipulated that, for the three weeks in issue, "two times the average weekly wage in the commonwealth" (§ 35) was $1,131.88, and that Bradley's pre-injury average weekly wage (§ 1[1]) was $1,469. In calculating the amount of § 35 benefits due Bradley for each of those weeks, the self-insurer treated his vacation pay as his actual earnings for that week, applied the statutory cap ("two times the average weekly wage in the commonwealth") and reduced the amount of his benefits accordingly.[1] Bradley protested, claiming that his vacation pay was a fringe benefit of his employment, like health insurance, and should not have been included in the calculation of his § 35 benefits. The administrative judge concluded that, because the "amount of vacation pay received, be it higher or lower than what the employee earns for nearby weeks actually worked, is the employee's wage earned for that week," the self-insurer's computation of benefits due was correct.

3. *Discussion.* Section 35 benefits are intended to compensate an employee for a loss of earning capacity caused by a work-related injury. See *Federico's Case*, 283 Mass. 430, 432 (1933); *Murphy* v. *Commissioner of the Dept. of Industrial Accs.*, 415 Mass. 218, 222 (1993). Prior to 1985, the Legislature had not specified the method for computing the average weekly wage an employee was capable of earning after sustaining a work-related injury, and much was left to the department's specialized knowledge and technical competence. See *Sjoberg's Case*, 394 Mass. 458, 460 (1985), construing § 35, as appearing in St. 1973, c. 978, § 6. However, § 35 must now be read with § 35D(1), as added by St. 1985, c. 572, § 45, which provides, as here relevant, that the post-injury weekly wage the employee is capable of earning is the "actual earnings of the employee during each week." Put another way, the weekly amount of

---

[1]For the first week of Bradley's vacation, the pay he received from his employer ($1,136.40) exceeded the statutory cap by $4.52, and the self-insurer paid no benefits. The second week, the employer paid $1,089, and the self-insurer $42.88. The third week, Bradley received $971.48 from the employer and $160.40 from the self-insurer.

Bradley's § 35 benefits was determined on the basis of the difference between his weekly post-injury actual earnings and his pre-injury average weekly wage.

Bradley reads the term "earnings" expansively in one instance (§ 1[1]) and narrowly in others (§§ 35, 35D[1]), in order to increase the amount of the difference between his pre-injury average weekly wage and his actual post-injury weekly earnings.[2] See, e.g., *Borofsky's Case*, 411 Mass. 379, 380 (1991). It is, however, an established rule of statutory interpretation that "the same words in different parts of a statute enacted at the same time, barring some contrary indication in the statute, should receive the same meaning." *Green* v. *Board of Appeals of Provincetown*, 404 Mass. 571, 573 (1989), and cases cited therein.

In *Borofsky's Case, supra* at 380, the employee argued that, for purposes of determining his average weekly wage, the value of his employer-paid health insurance benefits constituted earnings. Citing *Powers's Case*, 275 Mass. 515, 518-520 (1931), the court concluded that because the value of health insurance benefits did not "bear a close analogy to wages" it was not to be considered in determining the average weekly wage and left the matter to the Legislature to address the issue. The Legislature responded with St. 1991, c. 398, § 13, which expressly excludes the value of health insurance benefits from the calculation of an employee's average weekly wage.

No mention of vacation pay is made in St. 1991, c. 398, § 13. However, and as earlier noted, *Borofsky's Case, supra,* makes clear that the crucial test for determining whether vacation pay falls within the meaning of "earnings" is whether the pay received by Bradley from his employer while on vacation "bear[s] a close analogy to wages." See *Gunderson's Case*, 423 Mass. 642, 644 (1996); *Louis's Case*, 424 Mass. 136, 140 (1997). Based upon that analysis, tips, commissions, room and board, and partial disability payments have been included in determinations of an employee's average weekly wage. See *Powers's Case*, 275 Mass. at 520; *Perkins's Case*, 278 Mass. 294, 301-302 (1932); *Louis's Case*, 424 Mass. at 140; *Palomba's Case*, 9 Mass. App. Ct. 881, 881 (1980). Cf. *Commonwealth* v. *Massachusetts Org. of State Engrs. & Scientists*, 423 Mass. 667, 670 (1996) (under G. L. c. 32, § 28K, vacation

---

[2]Bradley makes no complaint or argument concerning the inclusion of vacation pay in the calculation of his pre-injury average weekly wage.

pay which was keyed to work performed was salary and not benefit).

*Herbst's Case*, 416 Mass. 648, 651 (1993), is closest to the point. In that case the court held that a public school teacher's paid summer vacation was properly included in the calculation of the teacher's average weekly wage. In reaching that conclusion the court looked to the formula set out in § 1(1) for determining an employee's average weekly wage, as well as the facts that the teacher received his income throughout the year, including the time he was on vacation; he was free to work during his vacation; he was ineligible for unemployment benefits during his vacation; and his health insurance benefits were not terminated during the summer.

There is textual authority for the proposition that an employer or insurer should not be allowed a credit or reduction in compensation benefits on account of vacation pay. See generally 4 Larson, Workers' Compensation §§ 57.41 — 57.46(c) (1998), and cases therein collected. For Massachusetts, see Locke, Workmen's Compensation § 612, at 734-735 (2d ed. 1981), wherein it is stated:

> "An employer may continue to pay wages to an injured employee or make other payments to him during the period of his disability. If these payments are not earned by services rendered during the period of claimed disability but represent payment for past services, a return on investment, fulfillment of a contractual obligation, or a gratuity, the insurer's obligation to pay compensation is not impaired, and the payments made may not be deducted from the award. There may be a controversy as to whether the payments demonstrate an employee's capacity to earn wages despite his disability. But to the extent that they are *unearned*, they are not a credit against compensation payable by the insurer." (Emphasis added.)

That statement is consistent with what the court, in a different context, subsequently held: "The date on which wages are *paid* . . . must be distinguished from the date on which they are *earned*" (emphasis in original). *Gunderson's Case*, 423 Mass. at 645, quoting from *Coffin* v. *Hannaford Bros.*, 396 A.2d 1007,

1009 (Me. 1979).[3]

As we read the applicable terms of the bargaining agreement in the instant case, Bradley did not receive vacation pay based upon his 1993 W-2 earnings because of past services. Rather he was entitled, under the bargaining agreement, to a three-week vacation at a rate of pay based upon his 1993 earnings because of services performed during the period of his disability. Although the number of vacation days and the rate of pay to which Bradley was entitled were established prior to his injury, we conclude that he *earned* that pay for work performed subsequent to his injury. Our holding is based upon the circumstances presented and the limited portion of the bargaining agreement before us.

In reliance upon the cases cited throughout this opinion as well as the applicable provisions of the bargaining agreement, the very purpose of compensation benefits, see *Louis's Case,* 424 Mass. at 140, and basic rules of statutory interpretation, see *Green* v. *Board of Appeals of Provincetown,* 404 Mass. at 573, we conclude that where, as here, vacation pay is earned during the employee's period of disability, that pay is properly included in the calculation of the employee's actual "earnings" within the meaning of that word as used throughout c. 152.

Because our response to the report of the single justice requires no further action on his part, we need not remand the matter to him for entry of an appropriate direction of further action by the department. The order of the reviewing board is affirmed.

*So ordered.*

---

[3]In *Gunderson's Case, supra,* the court concluded that, based upon a retroactive pay increase resulting from the settlement of a labor dispute after the occurrence of the employee's injury, an employee receiving compensation benefits was entitled to a recalculation of his pre-injury average weekly wage.